IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT PANTON,** | : | **CIVIL ACTION NO. 1:04-CV-0356** |
| **Plaintiff** | : | **(Judge Conner)** |
| v. | : | |
| **JOHN NASH,** | : | |
| **Defendant** | : | |

**MEMORANDUM**

Plaintiff, Robert Panton ("Panton"), a federal inmate confined, at all times relevant, to the Federal Correctional Institution at Schuylkill ("FCI-Schuylkill"), commenced this civil rights action on February 19, 2004, alleging that he was exposed to second-hand environmental tobacco smoke ("ETS") in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Presently pending are cross-motions for summary judgment pursuant to FED. R. CIV. P. 56. (Docs. 104, 107). For the reasons set forth below, defendant's motion (Doc. 104) will be granted and plaintiff's motion (Doc. 107) will be denied.

**I.   Statement of Facts**

On July 1, 1994, the Bureau of Prisons ("BOP")issued Program Statement 1640.03 stating that "[t]o advance towards becoming a clean air environment and to protect the health and safety of staff and inmates, the Bureau of Prisons will restrict areas and circumstances where smoking is permitted within its institutions and

offices." (BOP Program Statement 1640.03, Doc. 106-4, p. 6)[1]. "All areas of Bureau of Prisons facilities and vehicles are no smoking areas unless specifically designated as a smoking area by the Warden. . . ." (Doc. 106-4, p. 8). Although the Warden was given explicit discretion to make such decisions, the program statement also provided that "[t]o the maximum extent practicable nonsmoking inmates shall be housed in nonsmoking living quarters." (Id. at p. 10). At the pertinent time, the warden at FCI-Schuylkill was R. M. Reish ("Reish"). On March 6, 2000, in an effort to "advance towards a clean air environment within the Federal Correctional Institution, Schuylkill, to protect the health and safety of Staff and inmates," Warden Reish issued an "Institution Supplement"[2] specifically designating smoking and non-smoking areas inside[3] and outside the institution. (Institution Supplement 1640.03, Doc. 106-4, pp. 20-21).

The above regulations were in effect when John Nash ("Nash") assumed his role as warden at FCI-Schuylkill in November 2001. No new Program Statements were issued during his tenure and he made no changes to the Institution Supplement. (Doc. 108-3, p. 16, dep. pp. 61-62). On April 7, 2003, Nash issued a

---

[1] Documents will initially be identified by name and document number. Thereafter, for ease of reference, only the document number will be used.

[2] An institution supplement is "a document that supplements a Program Statement based on the specifics of an institution. And where the warden is given discretion, then he would determine what he wants done in this supplement" (Nash Deposition, Doc. 108-3, p. 11).

[3] FCI-Schuylkill is comprised of four housing units of approximately 260 inmates each. (Deposition of Warden John Nash, Doc. 108-3, p. 4, dep. p. 14).

memorandum to the inmate population regarding complaints he received concerning exposure to secondhand smoke in common areas within the housing units. (Nash 4/7/03 memorandum, Doc. 106-2, p. 42). Nash advised inmates that smoking regulations would be "vigorously" enforced. (Id.). He further reminded inmates that ". . . smoking is not authorized in common areas within the housing units. Smoking is only authorized in individual cells with doors in the closed position, preventing exposure to others within the unit. Additionally, two man cells will be identified as non-smoking rooms if one of the occupants is a non-smoker. All common area cells will be designated as non-smoking living areas. Inmates housed in these areas will not be allowed to smoke in their cells at any time." (Id.). A town meeting on the subject was also held by the Unit Managers. (Doc. 106-2, p. 30).

At this time, "Unit Rules and Regulations" were posted inside a locked bulletin board located on each side of the housing unit stating the following:

> Smoking is permitted in individual "two man cells" with the door in the closed position. Additionally, two man cells will be identified as non-smoking cells if one of the occupants is a non-smoker.
>
> Smoking is prohibited in all other areas of the Housing Units.

(Unit Rules and Regulations, Doc. 106-2, p. 14). Individual cells were not designated with signs as either smoking or non-smoking. (Doc. 108-3, p. 20, dep. p. 76). However, inmates who violated the smoking regulations by smoking in prohibited areas were subject to sanctions through the disciplinary process. (Declaration of Unit Manager Anthony Prantow, Doc. 106-2, p. 36, ¶ 10). According to plaintiff,

"[i]nmates have been written up by staff for smoking outside their assigned cells in the unit, and given extra duty." (Doc. 1, p. 2).

Nash did not know the number or percentage of smokers, or undertake studies to determine the number of non-smokers in the facility. (Doc. 108-3, p. 18, dep. pp. 67-68). Nor did he undertake any studies to determine whether a separate dormitory was "feasible" or "practicable." (Id.).

With regard to the ventilation system, if an issue arose, such as the travel of ETS to nonsmoking cells, Nash would not conduct an independent investigation but, rather, would contact the "facilities staff." (Doc. 108-3, p. 14, dep. p. 53; pp. 38-39, dep. pp. 149-54). The facilities manager describes the institution ventilation system as follows:

> The construction of FCI Schuylkill was completed in 1991. The institution was designed without air conditioning. The ventilation system does not recirculate indoor air from the two-man cells. That is, there are no air "returns" in the two-man cells; these cells have individual exhaust vents to the outdoors; therefore, air from a two-man cell designated as "smoking" could not have traveled from one cell to another via the ventilation system. Additionally, all of the cells have windows that can be opened. The windows do, however, have bars.
>
> The "common area" cells, which are also known as dormitory-style cells, do not have ventilation directly to the outdoors. However, two of the windows in the "common area" cells can be opened to the outdoors. The windows have security screens and bars.
>
> There is a cleaning and maintenance schedule for the ventilation systems in inmate living areas. Preventative maintenance on the air-handling units is conducted quarterly, unless otherwise required.

(Declaration of Facilities Manager, Tim Candelora, Doc. 106-6, p. 40, ¶¶ 4-6).

Panton was incarcerated at FCI-Schuylkill from November 2000 until February 2004. Prior to his transfer to FCI-Schuylkill, he was housed in a non-smoking environment. (Deposition of Robert Panton, Doc. 106-2, p. 11). Upon his arrival, he was assigned to a six-man dormitory-style cell.[4] (Doc. 106-3, p. 4, ¶ 4). Five of the inmates in the cell smoked. (Doc. 106-2, p. 7). Within days of his arrival, he complained that the smoke affected him and made him dizzy. (Id. at pp. 9-10). He was therefore moved to a two-man cell. (Id. at p. 10). On one other occasion, he was housed with a cellmate that was a smoker, but Panton would not permit him to smoke in the cell. (Doc. 106-2, p. 8).

After the passage of several months, he verbally complained to a counselor about being around inmates smoking in the common area, but does not recall the counselor's response. (Doc. 106-2, p. 11). He also represents that he complained to his Unit Manager that he was experiencing problems with his allergies such that he needed medical treatment. (Id. at p. 12). He would not identify the inmates who were violating the smoking policy. (Id. at pp. 28-29). In addition, he indicates that he was awoken during the night a few times from the smoke, which he attributes to the ventilation system. (Id. at p. 22).

Inmates may challenge any aspect of his or her confinement using the Bureau of Prison's ("BOP") administrative remedy procedure, which is set forth at 28 C.F.R. §§ 542 et seq. Inmates must first informally present their complaints to

---

[4]Reish was the warden when Panton first arrived.

staff, and staff shall attempt to informally resolve any issue before an inmate files a request for administrative relief. 28 C.F.R. § 542.13(a). If unsuccessful at informal resolution, the inmate may raise his complaint with the warden of the institution where he is confined. Id. at §542.14(a). If dissatisfied with the response, he may then appeal an adverse decision to the Regional Office and the Central Office of the BOP. Id. at §§542.15(a) and 542.18. No administrative appeal is considered finally exhausted until a decision is reached on the merits by the BOP's Central Office.

On April 5, 2003, Panton submitted an inmate request to staff member form to Nash requesting that a non-smoking unit be established and putting the institution on notice of his intention to file suit. (Doc. 106-2, p. 13; Inmate Request to Staff, Doc. 106-4, p. 22). In response, Nash informed him that BOP policy allowed inmates to decide whether they will smoke in a particular cell. (Nash Memorandum 4/14/03, Doc. 106-4, p. 23). "If a non-smoking inmate is assigned to a cell with an inmate who smokes, the inmate may request a new cell assignment with another non-smoker. In addition, we have taken away the designation of Smoking Area from the larger, dormitory common areas." (Id.). Subsequently, Panton approached Nash in the lunchroom and spoke to him about a nonsmoking unit. (Doc. 106-2, p. 17). According to Panton, Nash said he would look into it. (Id.). Panton again attempted, without success, informal resolution of the problem. (Inmate Request to Staff Member, Doc. 106-4, p. 24).

On April 25, 2003, he initiated the administrative remedy process by filing a request for administrative remedy. (Request for Administrative Remedy, Doc. 106-

4, p. 26).  He complained that "being in a housing unit where people smoke (although my cell mate doesn't smoke) is causing me to be sick with excessive coughing, dizziness, and watery eyes at times.  I taste smoke in my mouth and smell it constantly. . . .   Everyday in hailing [sic] smoke, when I am not smoking, is effecting [sic] me 'mentally and physically.'"  (Id. at p. 26).  He requested that either a non-smoking unit be established or inmates only be permitted to smoke outside.  Nash denied the request for essentially the same reasons stated in his response to the informal request.  (Response, Doc. 106-4, p. 28).

Panton pursued all avenues of appeal.  (Doc. 106-4, pp. 29-33).  The Regional Director responded by setting forth the current policy and stating as follows:

> Staff at FCI Schuykill have been diligent in their efforts to enforce the smoking policy and to take appropriate disciplinary action against violators.  As indicated by the Warden, a recent town hall meeting was conducted covering the rules and regulations regarding smoking in the housing units.  You have a responsibility to report violations of this policy to staff to ensure violators are held accountable for their actions.  Institution staff will continue to monitor smoking in an attempt to alleviate smoking by inmates in prohibited areas.  Accordingly, your appeal is denied.

(Id at p. 30).   His appeal was also denied at the national level.  The administrator of the National Inmate Appeals advised Panton that "[o]ur review indicates staff are making reasonable efforts to enforce the no-smoking rules.  We encourage you to contact staff if you see inmates violating the no-smoking policy.  Finally, if you believe you are continuing to experience medical problems from possible exposure to second-hand smoke, you are encouraged to contact the Health Services Department."  (Id. at p. 33).

7

The medical records show that while at FCI-Schuylkill, he received medical treatment on approximately eight occasions for complaints of sore throat, flu-like symptoms, chronic nasal congestion, ear infection, swollen adenoids, fever, chills, congestion, and allergies. (Doc. 106-4, pp. 38-42, ¶¶ 11-12, 18, 20-21, 23, 25-26). His treatment included, Tylenol, antibiotics, decongestants, antihistamines and nasal spray. (Id.). His lungs were consistently clear and there is no record that he experienced shortness of breath. (Id. at ¶¶ 20-21, 23, 26). Also, his July 30, 2003, chest X-ray was negative. (Doc. 106-4, p. 42, ¶ 27). He has never been diagnosed with asthma, emphysema, or bronchitis. (Doc. 106-2, p. 23). Panton does have a medical history of severe pneumonia, for which he was hospitalized in 1990. (Doc. 106-2, p. 23). Thereafter, he smoked for approximately fourteen months but then quit for health reasons. (Id. at p. 4). He has not smoked since.[5] Of further medical significance is permanent damage to his sinuses as a result of a January 1991 gunshot wound to the face. "Due to the gunshot wound and attendant surgical intervention, Mr. Panton has permanent changes in his left maxillary sinuses, which could have an increased susceptibility to infection, congestion, and any type of allergy symptoms." (Declaration of Registered Nurse, Donna Bertone, Doc. 106-4, p. 36, ¶ 5). He also has tested positive for a "positive purified protein derivative

---

[5]Although he admits that he purchased tobacco products while at FCI-Schuylkill, he claims the products were purchased to support another inmate's smoking habit and to "pay" another inmate for fixing his radio headphones. (Doc. 106-2, pp. 26, 32). He was not concerned that he was contributing to the secondhand smoke. (Id. at p. 32).

of tuberculin" test which measures the existence of tuberculosis ("TB") antibodies and past exposure to TB infection and requires that Panton receive a chest x-ray annually. (Doc. 106-2, p. 24). In July 28, 1999, while incarcerated at the Federal Correctional Institution at Edgefield, Panton declined TB treatment. (Doc. 106-4 at p. 38, ¶ 9). None of his chest X-rays to date indicate that the TB is active. (Doc. 106-2, p. 24). Although he claims that while at FCI-Schuylkill, he became dizzy, nauseated, and experienced headaches when he came in contact with smoke, there is no record of him seeking treatment for such ailments. (Doc. 106-2, p. 20).

Plaintiff's medical expert concluded the following:

> It is clear, that Mr. Panton's gun shot wound to his left Maxillary sinus, would cause him to be susceptible to upper respiratory problems. It can also be reasonably argued that being confined in an environment for three years at which time "smoking" was permitted at FCI Schuylkill, particularly in neighboring cells, and being exposed to ETS would "contribute" significantly to plaintiff's upper respiratory exacerbations. Plaintiff's complaint is reasonable, and his concerns about his future health problem is also reasonable. It should not, and cannot be blamed on Plaintiffs' [sic] past history of smoking, because his past surgical history of gunshot wound to his left maxillary sinus is most likely the primary cause of the original symptoms.

(Doc. 122-2, p. 3).

Panton was transferred from FCI-Schuylkill in February 2004. Since his departure, he has been treated for a sore throat and cold symptoms and has regularly sought refills for his nasal spray. (Doc. 106-4, pp. 43-44, ¶¶ 31-33). He does not currently suffer from any "serious" health problems. (Panton's Brief in Support of Motion for Summary Judgment, Doc. 109, p. 20).

In August 2004, Warden Nash left FCI-Schuylkill as a result of a promotion to a warden at a higher grade at an institution in Fort Dix, New Jersey. (Doc. 108-3, p. 4). On August 23, 2004, in response to Bureau of Prisons Program Statement 1640.04, which further restricted permissible smoking areas, Warden Ronnie Holt informed inmates *via* a memorandum that, effective November 15, 2004, inmates would be prohibited from possessing or using tobacco products in any area of the institution. (Holt Memorandum 8/23/04, Doc. 106-2, p. 38; Program Statement 1640.04, Doc. 106-4, pp. 12-18). The inmates were reminded of the implementation of the policy on October 27, 2004. (Id. at p. 39). Institution Supplement 1604.04, which rescinded Institution Supplement 1604.03, was issued on February 13, 2006, further clarifying that all areas of the institution are non-smoking/tobacco-free for the inmate population. (Institution Supplement 1640.04, Doc. 106-6, pp. 37-38).

Panton filed the instant action on February 19, 2004. (Doc. 1). Therein, he seeks the establishment of a non-smoking unit at FCI-Schuylkill and compensatory damages.

## II. Standard of Review

"Summary judgment serves as a minimal but important hurdle for litigants to overcome before presenting a claim to a jury." Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 314 (M.D. Pa. 2004). Faced with such a motion, the adverse party must produce affirmative evidence, beyond the disputed allegations of the pleadings, in support of the claim. FED. R. CIV. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Corneal v. Jackson Township, 313 F. Supp. 2d 457, 464

(M.D. Pa. 2003), aff'd, 94 Fed. Appx. 76 (3d Cir. 2004). "Such affirmative evidence--regardless of whether it is direct or circumstantial--must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance."  Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001)(quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989).  Only if this burden is met can the cause of action proceed.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. V. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see FED. R. CIV. P. 56(c), (e).

### III.   Discussion

The Eighth Amendment forbids prison officials from "unnecessarily and wantonly inflicting pain" on a prisoner by acting with "deliberate indifference" to the prisoner's serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  Panton alleges past, current, and future ETS-related harm.

In Helling v. McKinney, 509 U.S. 25, 35 (1993), the Supreme Court held that an Eighth Amendment claim could be based upon possible future harm to health, as well as present harm, arising from exposure to environmental tobacco smoke ("ETS").  The Court established a two-part test that a plaintiff must meet in order to prevail under the Eighth Amendment.  The objective component requires him to demonstrate that he "is being exposed to unreasonably high levels of ETS" and that the alleged wrong "is not one that society chooses to tolerate."  Helling, 509 U.S. at 35-36.  The subjective component requires him to show that the prison officials were deliberately indifferent to a serious risk of harm.  Id. at 36.

Objectively, the Eighth Amendment requires "a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." Helling, 509 U.S. at 35-36 (finding unreasonably high ETS exposure where plaintiff was housed with an inmate that smoked five packs of cigarettes a day); see also, Atkinson v. Taylor, 316 F.3d 257 (3d Cir. 2003) (finding unreasonably high ETS exposure where plaintiff was housed for seven months with "constant" smokers); Brown v. Minor, 2003 WL 1697538 (D.Del.2003), *aff'd* 316 F.3d 257 (3d Cir. 2003) (finding unreasonably high ETS exposure where plaintiff was housed with an inmate who smoked two packs per day).

Panton fails to meet the first prong of the Helling test because he did not produce any objective evidence concerning the level of ETS at FCI-Schuylkill or that the ETS amount created an unreasonable risk. Although he was housed in the same cell with smokers was when he first arrived at FCI-Schuylkill, it is undisputed that, immediately upon complaining of the exposure to smoke, Panton was removed from that environment and placed in a two-person cell with a nonsmoker. On one other occasion he was housed with a smoker but he admits that this was not a problem because the inmate did not smoke in the cell. With respect to the air quality in the cells, despite plaintiff's contention to the contrary, the cells were ventilated directly to the outside, not from cell to cell. And, the cells had windows that could be opened to allow fresh air from the outside to circulate through the cell.

Moreover, there is nothing in the medical records that would demonstrate that Panton was exposed to excessive amounts of ETS. Conspicuously absent from the record is any indication that, based upon a diagnosed medical condition that necessitated a smoke-free environment, a physician recommended or ordered that he be placed in a non-smoking environment. Nor, at any time during the course of his stay at FCI-Schuylkill, was he treated for any condition or ailment brought about by his exposure to second-hand smoke. Plaintiff's medical expert offers no opinion on whether Panton actually suffered from an ETS-related ailment and sheds no light on his failure to seek treatment for such an ailment while housed at FCI-Schuylkill. Plaintiff has failed to demonstrate that he encountered exposure to ETS that violates "[c]ontemporary standards of decency." See Atkinson, 316 F.3d at 262.

Subjectively, a plaintiff must prove that the defendant was deliberately indifferent to his serious medical needs. See Estelle, 429 U.S. at 106 . To be found deliberately indifferent, the official must know that the inmate faces a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). In the context of an inmate's "second-hand smoke" claim, "the adoption of a smoking policy . . . will bear heavily on the inquiry into deliberate indifference." Id. at 36.

Nash's enforcement of a policy that encouraged the separation of nonsmoking inmates from smoking inmates to the most practical extent indicates that defendant was not deliberately indifferent to any serious risk. See Helling, 509

U.S. at 36-37 (elaborating on the subjective prong by stating that implementation of smoking policies will affect the determination of deliberate indifference).  When Nash assumed his role as Warden at FCI-Schuylkill, BOP Program Statement 1640.03, which stated that "[t]o advance towards becoming a clean air environment and to protect the health and safety of staff and inmates, the Bureau of Prisons will restrict areas and circumstances where smoking is permitted within its institutions and offices" was already in effect.  ( Doc. 106-4, p. 6).  "All areas of Bureau of Prisons facilities and vehicles are no smoking areas unless specifically designated as a smoking area by the Warden. . . ." (Doc. 106-4, p. 8).  The smoking policy was prominently displayed on each side of the housing units.

Also, in April 2003, when Nash received complaints concerning exposure to secondhand smoke in common areas within the housing units, he advised inmates in a memorandum, that smoking regulations would be "vigorously" enforced. (Doc. 106-2, p. 42).  There was also a town meeting held by the Unit Managers to further discuss the smoking policy.  It is undisputed that inmates who violated the policy were disciplined.  In fact, Panton alleged in his complaint that "[i]nmates have been written up by staff for smoking outside their assigned cells in the unit, and given extra duty." (Doc. 1, p. 2).  In addition, Nash responded to Panton's request for informal resolution and his administrative remedy request in timely fashion and, each time, attempted to reassure Panton that he was making every effort to enforce the no smoking policy.

"Prison officials all over the country have struggled to accommodate the growing evidence that ETS is harmful and may subject them to liability." Oliver v. Deen, 77 F.3d 156, 157 (7th Cir. 1996). As noted above, adoption of the no smoking policy bears heavily on the inquiry into deliberate indifference. All indications are that Nash's attitude and conduct reflected no tolerance for smoking in his facility. Imperfect enforcement of the policy does not equate to deliberate indifference. See Franklin v. District of Columbia, 163 F.3d 625, 636 (D.C. Cir. 1998). Hence, Panton also fails to meet the second prong of the Helling test.

Lastly, as noted by defendant, Panton's request for a non-smoking housing unit has been rendered moot by his transfer from FCI-Schuylkill. (Doc. 105-1, p. 37). A prisoner lacks standing to seek injunctive relief if he is no longer subject to the alleged conditions he seeks to challenge. See Weaver v. Wilcox, 650 F.2d 22, 27, n. 13 (3d Cir.1981) (finding that prisoner's transfer from the prison moots claims for injunctive relief).

Based on the foregoing, defendant's motion for summary judgment (Doc. 104) will be granted and plaintiff's motion (Doc. 107) will be denied.

An appropriate order will issue.

   S/ Christopher C. Conner  
CHRISTOPHER C. CONNER  
United States District Judge

Dated:      March 26, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT PANTON,** | : | CIVIL ACTION NO. 1:04-CV-0356 |
| **Plaintiff** | : | (Judge Conner) |
| v. | : | |
| **JOHN NASH,** | : | |
| **Defendant** | : | |

## **ORDER**

AND NOW, this 26th day of March, 2007, upon consideration of the cross motions for summary judgment pursuant to FED. R. CIV. P. 56 (Docs. 104, 107), it is hereby ORDERED that:

1. Defendant's motion for summary judgment (Doc. 104) is GRANTED.

2. Plaintiff's motion for summary judgment (Doc. 107) is DENIED.

3. The Clerk of Court is directed to ENTER judgment in favor of defendant and against plaintiff.

4. The Clerk of Court is further directed to CLOSE this case.

              S/ Christopher C. Conner
              CHRISTOPHER C. CONNER
              United States District Judge